**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSISSIPPI**
**EASTERN DIVISION**

**UNITED STATES OF AMERICA**

**V.**                                                          **CAUSE NO. 4:11-CR-00005-CWR-FKB**

**JONATAN LOPEZ**

**ORDER GRANTING MOTION TO SUPPRESS AND DISMISS EVIDENCE**

The above-styled matter is before the Court on the Motion to Suppress and Dismiss Evidence[1] of defendant Jonatan Lopez, who argues that a traffic stop resulting in the discovery of several kilograms of narcotics violated the prohibitions of unreasonable searches and seizures contained in the Fourth Amendment. After reviewing the briefs of both the Government and the defense, along with the testimony and arguments presented at a hearing held on August 26, 2011, the Court has concluded that the motion must be granted.

**FACTS[2]**

Sergeant Andy Matuszewski (hereinafter "Matuszewski") of the Lauderdale County Sheriff's Department is a member of that office's Interstate Criminal Interdiction Unit.[3] On

_____

[1] Motion to Suppress and Dismiss Evidence [Docket No. 14].

[2] In an evidentiary hearing, the Court sits as a finder of fact and must resolve all disputed issues. *United States v. Willis*, 525 F.2d 657, 659 (5th Cir. 1976); Fed. R. Evid. 104 cmt. ("To the extent that [admissibility] inquiries are factual, the judge acts as a trier of fact."). The Court is required to determine the credibility of the witnesses in order to fulfill its duty to resolve the disputed questions of fact. *Id.*

[3] Transcript of the live hearing held on August 26, 2011 (hereinafter "Hearing") at 4. Due to the urgency with which the Court requested this transcript, it is an extremely rough draft that has not enjoyed the benefit of careful copyediting. Therefore, where appropriate, this opinion substitutes typographical anomalies with the terms that correspond to notes taken during the hearing.

October 26, 2010, Matuszewski was positioned in his patrol car near the bottom of a large hill between the westbound and eastbound lanes of Interstate 20 at a location just east of Meridian, Mississippi. From that vantage point, Matuszewski could see cars coming over the hill and make early determinations regarding the speeds of the vehicles. His vehicle, however, was not equipped with radar.[4]

**The Traffic Stop.** At approximately 4 p.m., a small black sedan caught Matuszewski's attention as it reached his side of the hill and quickly began decelerating. A blue Chevrolet Cobalt immediately followed, and like the black sedan, the Cobalt decelerated immediately after cresting the hill and pulled into the right-hand lane away from the lane nearest Matuszewski, although no other cars were nearby.[5] The Cobalt continued slowing down even past Matuszewski's position and eventually settled on a speed of roughly 60 miles per hour.

Matuszewski's interest piqued, he pulled out onto the eastbound[6] roadway and caught up with the two cars. He first pulled alongside the blue Cobalt, which was driven by Jonatan Lopez (hereinafter "Lopez"), who is unmistakably Hispanic. Matuszewski testified that as he rode alongside the Cobalt, which still was traveling at approximately 60 miles per hour and within the

---

[4] Hearing at 4.

[5] Hearing at 5-6. Under cross-examination, Matuszewski later admitted that drivers adhere to "good practice" by leaving one lane between themselves and any police officers stopped by the side of a roadway and that Lopez's lane change "didn't mean he was doing anything ill[egal]." Hearing at 42.

[6] Matuszewski testified that, in his experience, drug traffickers on Interstate 20 ship drugs using the eastbound lanes and transport money – presumably the proceeds from successful drug transactions – in the westbound lanes. Hearing at 55-56.

speed limit,[7] he immediately grew suspicious of Lopez because (1.) Lopez "appeared to be very tense" and had both hands on his steering wheel at the 10 o'clock and 2 o'clock positions,[8] (2.) Lopez would not turn his head to make eye contact with Matuszewski,[9] and (3.) Lopez was

---

[7] The speed limit along Mississippi's interstate highways for day and night driving is 70 miles per hour. *See* Mississippi Drivers License Manual at 56, http://www.dps.state.ms.us/dps/dps.nsf/webpages/LicenseManuals_DriversLicenseManuals (follow "Mississippi Drivers License Manual.pdf" hyperlink) (last visited September 20, 2011) (hereinafter "Mississippi Drivers License Manual"). Lopez, like any other driver, could "drive at less than the legal limit, but not less than the posted minimum speed limit." *Id.*

[8] Hearing at 6. At page 49 of the Mississippi Drivers License Manual begins the section entitled, "Safe Driving Practices," and within that section the manual provides "Tips for Safer Driving." The second tip instructs that motorists should:

> [d]rive with both hands on the wheel. The ideal position for holding the wheel varies with each driver, but at least one-third of the wheel should separate the hands. As a rule, the left hand should be on the wheel between 9:00 and 10:30, as on the face of the clock, with the right had between 2 and 4.

*Id.* at 51. In other words, Lopez was employing a safe driving technique, holding the steering wheel as a licensed driver should. This should not have raised the officer's suspicion any more than one who is driving within the posted speed limit should have done so.

[9] Hearing at 6. Looking in the direction in which one's vehicle is traveling generally should not raise an officer's suspicions. The Fifth Circuit has held that in determining the constitutional reasonableness of a traffic stop, "whether a driver looks at an officer or not should not be accorded much weight." *United States v. Rangel-Portillo*, 586 F.3d 376, 381 (5th Cir. 2009) (internal quotation marks, citations, and modifications omitted). More recently, in addressing the question of whether a traffic stop by Border Patrol agents satisfied the Fourth Amendment, the Fifth Circuit "attach[ed] little significance to the failure of the driver . . . to make eye contact with the agents while they drove beside her vehicle for approximately *three minutes*." *United States v. Soto*, ___ F.3d ___, 2011 WL 3447425, *4 (5th Cir. Aug. 9, 2011) (emphasis added). Obviously, Matuszewski's inability to draw Lopez's attention lasted for far less than three minutes, as noted above, and even if it had not, Fifth Circuit precedent would support this Court's determination that this reason was not, in truth, a justifiable basis for Matuszewski's suspicion.

"sweating profusely."[10]

Matuszewski sped ahead to investigate the black sedan to "make sure there wasn't anything suspicious or more [suspicious] than I had already seen,"[11] but any suspicions of unlawful activity were assuaged when the occupants – at least one of whom Matuszewski observed to be a white male[12] – turned their heads in Matuszewski's direction and "glanced at" him.[13]

Matuszewski then exited the interstate and pulled his patrol car on to the "on" ramp, where he sat and waited for Lopez. According to Matuszewski, "my purpose was to get to the opposite side of this ramp and be able to see the vehicles that went [by. M]y sus[picions] *had been raised* to this point by the defendant's vehicle and his actions . . . based on my experience and training[.]"[14] Lopez soon came and went, and Matuszewski pursued him. According to

---

[10] Hearing at 8. Matuszewski made this observation despite having to have viewed Lopez through two window panes and with both vehicles traveling at least 60 miles per hour. Moreover, Matuszewski never mentioned in his testimony any corroboration of Lopez's profuse sweating once he finally viewed Lopez face to face, and the video recording of the episode does not show Lopez dabbing his brow or taking any other action that one would associate with profuse sweating. The Court therefore views this representation with heavy skepticism, especially when taken with Matuszewski's other testimony concerning Lopez's gripping of the steering wheel and looking in the direction in which his vehicle was traveling.

[11] Hearing at 8.

[12] Hearing at 47. Although Matuszewski did not testify as to whether he noticed Lopez's race or ethnicity when the two drove alongside each other, the fact that Matuszewski recognized the skin color of at least one of the black sedan's occupants supports this Court's inference that Matuszewski knew that Lopez was Hispanic. *See infra* at 2. *See also* Exhibit 18 (Matuszewski Report) at 2 (makes note of race of driver of the black sedan).

[13] Hearing at 8.

[14] Hearing at 11-12 (emphasis added). *See also* Government Exhibit 18 (Matuszewski exited the interstate so that he would be able to observe Lopez's vehicle further).

Matuszewski, Lopez had increased his rate of speed since the two had driven alongside each other a few minutes earlier at approximately 60 miles per hour.[15]

As Matuszewski followed, he observed Lopez trailing another vehicle in the left-hand lane[16] before pulling into the right-hand lane in front of an 18-wheeler.[17] Matuszewski "found this to be hazardous . . . [and] in violation of state statutes," and at that point, Matuszewski initiated a traffic stop by turning on his blue lights.[18] More specifically, Matuszewski explained in court that he "observed two violations of state law[,] one of which was that the defendant was following two different vehicles in an unsafe manner entirely too close . . . and then when he changed lanes back in front of the semi, again didn't indicate his intention to do so[,] and did so at a distance that was very close that could have caused the hazard with the semi[ ]driver."[19]

---

[15] Hearing at 13. According to Matuszewski, whose vehicle was not equipped with radar, "I noticed that the slow s[p]eed he was traveling at before is no longer t[he] case[. H]e's moving along kind of quick[. It is] not very clear on the video because [of] your depth per[cep]tion." What Matuszewski does not say, because he cannot, is that Lopez was speeding. Furthermore, since Lopez had been driving below the posted speed limit, he may have increased his speed to the posted limit – something Matuszewski had no problem with the white driver of black vehicle doing, and something which did not raise his suspicions. *See* Hearing at 8.

[16] Hearing at 13. "[A]t this point he ca[me] right behind that semi[ ] that had just passed me on the on ramp[. H]e's come up directly behind it[,] a car len[gth] away." Additionally, as Matuszewski narrated a video recording of the episode in the August 26 hearing, he took note of a van passing Lopez, and "as soon as that van passed by him the suspect moved over at that point directly behind that van[,] again a very close pro[ximit]y[.]"

[17] Hearing at 13. Still narrating the video recording, Matuszewski told the Court that "you will notice right about now [Lopez] changed lanes back in front of [the tractor] trailer again without signaling in the very close proximity to the vehicle[.]"

[18] Hearing at 13.

[19] Hearing at 15. Matuszewski elaborated by conceding that no hard and fast standard governs the question of whether a given distance is sufficient or insufficient but that "[t]he rule of thumb . . . i[s] one car length for every ten miles an hour forward speed . . . ." *See also* Hearing

At some point practically contemporaneous with the stop's initiation, Matuszewski "ma[de] note of the license plate and enter[ed] that into the mobile dat[a] in my patrol vehicle to make s[ure] there's not any warrants or [that the] vehicle hadn't been involved in some kind of a crime so I'll know what I'm walking up on . . . ."[20] The inquiry apparently provided no suggestion of malfeasance.

**The First Search.** Lopez pulled onto the right-hand shoulder of the roadway, where Matuszewski approached from the passenger side of the vehicle and asked Lopez for his driver's license, the vehicle's registration, and proof of insurance.[21] According to Matuszewski, Lopez's hand "was visibly shaking" as he fumbled with the glove compartment, the operation of which Lopez appeared to be unfamiliar, but Lopez ultimately produced three documents: (1.) what appeared to be a driver's license issued in Mexico, (2.) proof of insurance issued in Pennsylvania to a person named Jose Mendoza Rodriguez, and (3.) a copy of a court paper from Cooke County, Illinois.[22] As with many of his observations regarding otherwise seemingly innocuous behavior, Matuszewski told the Court that Lopez's apparent nervousness at having been pulled over on the side a four-lane highway is "not what we are accustomed to seeing with the general motoring public."[23]

_____

at 51 (Matuszewski testified this is the "rule of thumb" and not the law).

[20] Hearing at 13.

[21] Hearing at 17.

[22] Hearing at 17-18; Government Exhibit 18 at 3.

[23] Hearing at 18. *See* Hearing at 6 (regarding Lopez's lane change without other cars nearby, "[t]his is . . . different than what I'm used to seeing from [the] normal motoring public so it caught my attention"); Hearing at 8 (regarding failure to make eye contact, "mo[s]t of the time

By this point, according to Matuszewski, three reasons for suspicion of wrongdoing had presented themselves: a lane change without a signal, following a vehicle too closely, and Lopez's Mexico-issued driver's license.[24] A fourth possible basis for suspicion arose from an incongruity in Lopez's account regarding the car's true owner; Matuszewski told the Court that after he asked Lopez to step outside and continue their conversation, Lopez said that his cousin owned the car, whereas "before he had said it was his friend's vehicle."[25] Matuszewski also reserved doubts as to whether Lopez's license "was a legitimate document at all."[26]

After his initial conversation with Lopez, Matuszewski asked Lopez to remain between the two vehicles while Matuszewski returned to his patrol car to "do a records check on the information that[ ] he's provided to me to make s[ure] he's not wanted anywhere [and] to see if

---

we notice as we pull up next to members of the motoring public in a marked patrol unit[ ] they are going to glance over[ ] . . ."; Hearing at 8 (regarding profuse sweating, "[I] found that to be [un]usual"); Hearing at 44 (regarding Lopez's lengthy deceleration, "very different than the average motoring public"); Hearing at 43 (regarding Lopez holding the steering wheel at the 10 and 2 positions when "80 percent" of drivers hold steering wheel below the 9 and 3 positions)

[24] Hearing at 23 ("I had reason to believe that the license that he provided me was not valid . . . or not valid for [use] in this country[.]"). Apparently, no information was available regarding Lopez's driver's license. During cross-examination, Matuszewski admitted that his records check provided no suggestion that the license was invalid, but "[t]hey didn't tell me it was valid either." Hearing at 53.

[25] Hearing at 24.

[26] Hearing at 26. On the videotape, Matuszewski is heard on multiple occasions expressing his view that the license is "bogus." His insistence that the document was invalid raises the question: what reason did Matuszewski have to be believe that the license was bogus or invalid? The lack of any apparent explanation also affects this Court's view of Matuszewski's credibility accordingly.

he's in the country legally."[27] From his patrol car, Matuszewski alerted his two partners that he was conducting a traffic stop and requested their presence; the video also records Matuszewski requesting the assistance of the other officers because "I'm gonna search him."[28] About that time, Matuszewski received a response to his inquiry confirming that the car was registered under the same name that appeared on the proof of insurance.

Matuszewski also attempted to contact the Blue Lightning Operations Center[29] regarding Lopez's background, but he was unable to reach them.[30] He then contacted his local dispatch center to make the same inquiry. So far as the record indicates, none of the sources upon whom

---

[27] Hearing at 25-26. Matuszewski testified that Hispanic drivers often "provide us with an immigration document of some kind, be it an immigration or customs enforcement card or a passport with a visa in it. Generally we find people who provide us a single form of foreign documentation like a driver's license from another [nation] generally don't have that supporting documentation to prove that they are in the country legally." Hearing at 26. The record contains no indication that Matuszewski ever asked Lopez for any documents regarding his immigration status. Moreover, the idea that someone bearing Lopez's physical characteristics should be presumed to have entered the country illegally unless he immediately and unsolicitedly proves otherwise strikes the Court as alarming, to put it mildly. What paper does Matuszewski (or the Government) propose that one of the 50.5 million Americans of Hispanic origin must show to prove they are traveling legally along the interstate in Mississippi? *The Hispanic Population: 2010*, U.S. Census Bureau (May 2011), http://www.census.gov/prod/cen2010/briefs/c2010br-04.pdf (last visited September 20, 2011).

[28] Matuszewski is also heard advising the dispatcher to "see if you can come up with *anything* and call me on my radio" (emphasis added).

[29] Matuszewski explained that the Blue Lightning Operations Center is a coordinated effort among several law enforcement agencies that is "the best source that I have available to me to be able to get information on the vehicles and/or persons[,] where they may have traveled from[,] to[,] if they are in the country legally or not . . . . [T]hat's generally our first phone call when we're trying to find out this information." Hearing at 27-28.

[30] Matuszewski told the Court that his efforts to contact Blue Lightning "took some time[. E]vidently they were extremely busy and didn't answer the telephone initially when I called." Hearing at 27.

Matuszewski inquired provided him with any indication that Lopez was wanted in connection with any crime or that Lopez had entered the country illegally.

**The Second Search.** Ultimately, some 16 minutes after initiating the traffic stop, Matuszewski emerged from his patrol car and told Lopez that he planned to issue a warning citation.[31] By this time, the purpose of the traffic stop had been completed. Immediately thereafter, however, Matuszewski continued the detention by asking Lopez "if there was anything illegal in the vehicle."[32] To Matuszewski's surprise, Lopez "nodded and spoke and nodded in the affirmative."[33] Matuszewski again asked whether Lopez's car contained anything illegal, and Lopez "said yes and nodded in the affirmative again."[34] When Matuszewski "asked him in Spanish if there were any drugs in the vehicle or narcotics[, . . .] that's when he said oh, no, no, quickly responded there wasn't anything there and spoke and said that we could check [if] we wanted[.] I asked him . . . so you don't mind if we check[?]" Matuszewski understood Lopez to reply, "That's fine."[35] Despite this abundantly apparent language barrier, Matuszewski did not

---

[31] Hearing at 29. Specifically, the written warning cited Lopez for "following too closely and no insurance." Hearing at 34; Government Exhibit 5. The Court, however, notes that the insurance had not expired. Matuszewski had looked at the "effective date rather than the expiration date." Hearing at 23. It was only a few days before the suppression hearing that he learned that the insurance was not due to expire until June 2011, more than seven months after Lopez's arrest. Matuszewski explained, "[i]t is not really a huge issue there.  I had reason to believe that the license that he provided me was not valid . . . for [use in ] this country. [W]e had the additional traffic [violations]." *Id*.

[32] Hearing at 30.

[33] Hearing at 30.

[34] Hearing at 30.

[35] Hearing at 30.

use Spanish when asking Lopez for consent to search the car.[36]

At almost this precise moment, Matuszewski's partners came upon Lopez's car and began a search, which ultimately yielded a discovery of several kilograms of cocaine.[37]

On March 22, 2011, a federal grand jury indicted Lopez for possession of more than five kilograms of cocaine hydrochloride with intent to distribute.[38] Lopez moved to suppress the evidence discovered in the October 2010 search as the fruits of a violation of his rights established by the Fourth Amendment.

## **ANALYSIS**

Less than three years after the most notable of the Nuremberg Trials, wherein he served as chief prosecutor against one of the gravest atrocities ever exacted upon the human race, Justice Robert H. Jackson wrote that the guarantees established by the Fourth Amendment

> are not mere second-class rights but belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government. And one need only briefly to have dwelt and worked among a people possessed of many admirable qualities but deprived of these rights to know that the human personality deteriorates and dignity and self-reliance disappear where homes, persons and possessions are subject at any hour to unheralded search and seizure by the police.[39]

Moreover, Justice Jackson noted aptly that "the right to be secure against searches and

---

[36] At other portions of his testimony, Matuszewski described the "noisy environment on the side of the highway," and he could tell at times that Lopez was having difficulty hearing him. Hearing at 22.

[37] Hearing at 36.

[38] Redacted Indictment [Docket No. 1] at 1.

[39] *Brinegar v. United States*, 338 U.S. 160, 180-81 (1949) (Jackson, J., dissenting).

seizures is one of the most difficult to protect. Since the officers are themselves the chief invaders, there is no enforcement outside of court."[40]

This Court cannot overstate the seriousness with which it carries that duty. Whenever a defendant contends that he has fallen victim to an unreasonable search or seizure, this Court does not take lightly its role as the finder of fact[41] and will leave no aspect of the police's conduct unscrutinized.[42] When the police proceed without the authority of a duly issued and valid warrant, this Court will not hesitate to hold the Government to its responsibility of proving the constitutional validity of its actions.[43] And where that burden has not been carried, this Court will unflinchingly fulfill its obligation to preclude the Government from making use of the product of that unconstitutional act.

In the case at hand, Lopez's motion to suppress implicates both of the Fourth Amendment's protections: first, he argues that the traffic stop itself amounted to an unreasonable seizure for lack of probable cause, and second, he contends that the search of his automobile was unreasonable because the police gained his consent involuntarily.

**Lopez's Seizure.** With regard to Lopez's first argument, there is no doubt that his traffic stop amounted to a seizure.[44] Therefore, in order to have been reasonable, it must have been

---

[40] *Id.* at 181.

[41] *United States v. Kreczmer*, 636 F.2d 108, 110 (5th Cir. 1981).

[42] *Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (Fourth Amendment questions are "measured in objective terms by examining the totality of the circumstances").

[43] *United States v. Roberts*, 612 F.3d 306, 309 (5th Cir. 2010).

[44] *United States v. Grant*, 349 F.3d 192, 196 (5th Cir. 2003).

supported at a minimum by "reasonable suspicion supported by articulable facts that criminal activity may be afoot."[45] "[A]n unparticularized suspicion or hunch"[46] will not suffice. "This demand for specificity in the information upon which police action is predicated is the central teaching of th[e] [Supreme] Court's Fourth Amendment jurisprudence."[47]

This Court has little difficulty in determining, as a matter of fact, that the totality of the circumstances preceding Lopez's traffic indiscretions did not create an objectively reasonable suspicion justifying a stop. Matuszewski testified that, upon cresting the hill and first coming into view, Lopez's sudden deceleration and lane change was "different than what I'm used to seeing from the normal motoring public so it caught my attention."[48] Of course, the black sedan in front of Lopez exhibited the same behavior, but when that car's white driver and passenger glanced in Matuszewski's direction, all suspicion of wrongdoing evaporated.[49] Therefore, the only differences in Lopez's behavior prior to Matuszewski's exit from the roadway were (1.) Lopez's use of two hands at the 10 o'clock and 2 o'clock positions on his steering wheel, (2.) Lopez's unbroken attention toward the road in front of him, and (3.) the great volume of sweat pouring

---

[45] *United States v. Jones*, 234 F.3d 234, 241 (5th Cir. 2000) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

[46] *Jones*, 234 F.3d at 241.

[47] *Terry v. Ohio*, 392 U.S. 1, 22 n.18 (1968).

[48] Hearing at 6.

[49] *See supra* at 2 n.5. All suspicion evaporated even though Matuszewski testified that the driver of that vehicle caught his attention when he "made some rapid changes in driving[. He] slowed down rapidly." Hearing at 5. And it was, in Matuszewski's view, "not the kind of thing we normally see." *Id.*

down Lopez's face, toward the account of which this Court harbors doubts.[50]

All other skepticism aside, these circumstances amount at most to unparticularized suspicion and would not have justified a stop. The matter concerning Lopez's hands strikes this Court as particularly outlandish.[51] Undoubtedly, the Fourth Amendment "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."[52] But even so, "an officer's reliance on a mere 'hunch' is insufficient to justify a stop."[53] The suggestion that criminal activity might be evinced by the placement of a driver's hands on a steering wheel which is within the position that the state recommends – and, indeed follows the safe driving tip – is, with all due deference to experience and training, nothing short of preposterous.[54] At best, it amounts to the sort of "hunch" that has been repeatedly rejected by the Supreme Court as a basis for even a temporary detention.

At worst, it is what Lopez's attorney argues: a pretext for a racially motivated police action. In his brief submitted after the August 26 hearing, Lopez contends that Matuszewski targeted Lopez over the other car's white driver because of Lopez's race[55] and that, like all

---

[50] *Supra* at 4 n.10.

[51] *See* Hearing at 6; *supra* at 3 n.8.

[52] *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

[53] *Id.* at 274.

[54] *See United States v. Rangel-Portillo*, 586 F.3d 376, 381 (5th Cir. 2009) (rejecting officer's reliance on law-abiding factors to justify his reasonable suspicion to stop vehicle).

[55] Memorandum in Support of Defendant's Motion to Suppress (hereinafter "Lopez's Second Memo") [Docket No. 19] at 6.

government decisions made on the basis of race, the traffic stop must be subjected to strict scrutiny.[56] If Matuszewski had stopped Lopez after his initial observations, then this Court would not hesitate to agree with Lopez.[57]

However, the Supreme Court has made clear that the constitutional reasonableness of a traffic stop does not hinge on "the actual motivations of the individual officers involved," and so long as probable cause exists to believe that a traffic violation has occurred, the true reason for which the officer initiated the seizure is irrelevant.[58] This Court has reviewed the video recording of the lane change on which Matuszewski based the stop and is satisfied that it created probable

---

[56] Lopez's Second Memo at 6 (citing *United States v. Frazier*, 408 F.3d 1102, 1108 (8th Cir. 2005); *United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997)).

[57] Having debunked the reasons articulated by Matuszewski, the Court is left with Lopez's ethnicity as the only basis for the suspicion that Matuszewski admits that he formed prior to Lopez's traffic infraction. But ethnicity alone cannot supply reasonable suspicion. *United States v. Brignoni-Ponce*, 422 U.S. 873, 885-87 (1975). And by concluding that Supreme Court precedent renders the eventual traffic stop reasonable, the Court does not suggest that Matuszewski's decision to watch Lopez more closely and ultimately to pull him over for minor infractions were not tainted by his initial suspicions. *See supra* at 4 (citing Hearing at 11-12 ("my suspicions had been raised")). Suspicions clearly based on lawful conduct, or at least conduct in which law-abiding citizens are just as likely to be engaged, are not reasonable. *Rangel-Portillo*, 586 F.3d at 381. Not only was he suspicious of Lopez from the instant he saw him, but Matuszewski appeared to be on a mission to search his vehicle. *See supra* at 8.

[58] *Whren v. United States*, 517 U.S. 806, 813 (1996). This conclusion should not be read to mean that a seizure is legal merely because the Fourth Amendment has been satisfied. It is fundamental that *every* Government action must accord with *every* constitutional demand. Therefore, a search or seizure that complies with the Fourth Amendment but violates the Fourteenth Amendment's Equal Protection Clause – that is, an otherwise valid search or seizure performed because of the subject's race – must survive the most exacting scrutiny. *United States v. Travis*, 62 F.3d 170, 173-74 (6th Cir. 1995); *Whren*, 517 U.S. at 813 ("[T]he Constitution prohibits selective enforcement of the law based on considerations such as race.").

cause to believe that a traffic violation had occurred.[59] With that established, the question of whether Matuszewski already had decided to pull Lopez over is less relevant. Lopez's lane change opened the door to a permissible stop, and when Matuszewski walked through it, he inflicted no injury to Lopez's Fourth Amendment rights.

**The Search Attendant to Lopez's Traffic Stop.** Moreover, Matuszewski's actions in the moments immediately following the stop did not amount to an unconstitutional search. The Fifth Circuit has held that an officer conducting a traffic stop may "request to examine a driver's license and vehicle registration or rental papers . . . and to run a computer check on both. An officer may also ask about the purpose and itinerary of a driver's trip during the stop,"[60] because "[a]ll these inquiries are within the scope of investigation attendant to the traffic stop."[61]

But when Matuszewski's efforts turned up no probable cause to believe that Lopez was

---

[59] *See* Miss. Code Ann. § 63-3-619(1) ("The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway."); Miss. Code Ann. § 63-3-613(2) ("The driver of a vehicle may overtake and, allowing sufficient clearance, pass another vehicle proceeding in the same direction either upon the left or upon the right of a roadway . . . when such movement can be made in safety."). In the Court's view, the video does not demonstrate beyond all doubt that Lopez committed a traffic infraction, but that is not what probable cause requires. *See Maryland v. Pringle*, 540 U.S. 366, 371 (2003) ("the substance of all the definitions of probable cause is a reasonable ground for belief of guilt") (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). The video recorded Matuszewski's patrol car closing quickly on Lopez, who then moved into the right-hand lane in front of the 18-wheeler. Yielding the lane to an emergency vehicle barreling down the highway is not unreasonable. Furthermore, the 18-wheeler's brake lights do not appear to brighten in the video, and the space between the Cobalt and the 18-wheeler does not appear to be any less than two car lengths. Nevertheless, because the question presents a close call, and because the standard of probable cause is not one that commands certainty, the Court defers in this case to Matuszewski's representations of Lopez's driving behavior.

[60] *United States v. Brigham*, 382 F.3d 500, 508 (5th Cir. 2004).

[61] *Id.*

15

involved in other criminal acts, no reason existed to extend the stop beyond its purported purpose.[62] Therefore, the ensuing search of Lopez's car could not have been related to the stop itself, as the Government seems to suggest.[63] The only objectively reasonable basis for the stop was Lopez's traffic infraction, and based on its review of the record, the Court finds that neither reasonable suspicion nor probable cause permitted any additional extension of the seizure. For that reason, the only possible reason to justify the police's search of Lopez's car was his consent.

**The "Consent" Search.** It is well established that consent serves as an exception to the Fourth Amendment's requirement that searches be supported by warrants.[64] But "[i]n relying upon the consensual search exception, the government must prove, by a preponderance of the evidence, that consent was freely and voluntarily given."[65] Consent is not voluntary if it "was the product of duress or coercion, express or implied,"[66] and the Government's burden "is not satisfied by showing a mere submission to a claim of lawful authority."[67] Moreover, the question

---

[62] *Williams v. Kaufman Cnty.*, 352 F.3d 994, 1011 n.57 (5th Cir. 2003) ("[A] detention should end as soon as the underlying justification for the stop is served, for instance by running a computer check that comes back negative; any further detention becomes an unreasonable seizure because it is unsupported by probable cause.").

[63] Specifically, the Government cites *Terry v. Ohio*, 392 U.S. 1 (1968), for the proposition that a search reasonably related in scope to the circumstances leading to a justifiable stop does not offend the Fourth Amendment. Government's Memorandum in Opposition to Defendant's Motion to Suppress Evidence [Docket No. 17] (hereinafter "Gov't memo") at 2.

[64] *Davis v. United States*, 328 U.S. 582, 593-94 (1946).

[65] *United States v. Tompkins*, 130 F.3d 117, 121 (5th Cir. 1997).

[66] *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973).

[67] *United States v. Villarreal*, 963 F.2d 770, 777 (5th Cir. 1992).

of whether consent was voluntary is an issue of fact.[68]

"Although . . . no single factor is dispositive or controlling,"[69] the Fifth Circuit has identified six issues to be considered by courts evaluating the voluntariness of an act of consent:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.[70]

The Court has reviewed the record before it, has considered the evidence contained therein as thoughtfully as it knows how, and has assigned particular facets of the record their due weight in accordance with the Court's duty as the arbiter of fact. Within that role, the Court is compelled to find that the Government has not fulfilled its obligation to prove that Lopez's consent was voluntary.

The Court is convinced beyond any doubt that the first and fifth factors weigh against the Government. Although Lopez had not been arrested formally when Matuszewski initially sought his consent, a reasonable person in Lopez's position would have perceived "the degree of restraint associated with formal arrest;"[71] by the time Lopez acquiesced to a search, his traffic stop had reached almost 20 minutes in length, and he had not yet received the citation he had been promised. Matuszewski also had not yet returned the driver's license to Lopez. Moreover, Matuszewski himself testified on cross-examination that when he told Lopez that he planned to

---

[68] *Bustamonte*, 412 U.S. at 227.

[69] *United States v. Mendez*, 431 F.3d 420, 429 (5th Cir. 2005).

[70] *United States v. Olivier-Becerril*, 861 F.2d 424, 426 (5th Cir. 1988).

[71] *United States v. Bengivenga*, 845 F.2d 593, 600 (5th Cir. 1988).

issue a warning, "I didn't say [tha]t it would all be over."[72]

Additionally, the Government has introduced no specific evidence regarding Lopez's education and intelligence, and because it bears the burden of proof on this question,[73] the Court would be obligated to view a void of evidence in Lopez's favor. But what evidence does exist leads this Court to conclude that the consent was not intelligently given; the dialogue between Lopez and Matuszewski clearly suffered from a language barrier, as evinced by Lopez's two "confessions" that his car contained illegal items.[74] That language barrier inhibited Lopez's ability to act knowingly and intelligently – two necessary components of a valid consent.[75]

Other factors also do not fall to the Government's side of the debate. In particular, the timing of the consent presents the hint of coercion. When Matuszewski returned from his patrol

---

[72] Hearing at 54. Indeed, it was not over. Lopez had been pulled over by blue lights, approached by an officer carrying a sidearm, had been told to get out of the car, was patted down, was instructed to remain outside of his vehicle, and had his drivers license and other papers taken from him. Certainly, Lopez was not free to leave. A reasonable person standing in his shoes would not have thought she could leave. As explained more fully *infra*, the consent was not voluntary.

[73] The Government's burden to show the voluntariness of a suspect's consent to a warrantless search is greater when a suspect does not speak or clearly understand the English language. *Kovach v. United States*, 53 F.2d 639 (6th Cir. 1931) (cited approvingly by *Bumper v. North Carolina*, 391 U.S. 543, 548 n.12 (1968)).

[74] Hearing at 30.

[75] *Schneckloth v. Bustamonte*, 412 U.S. 218, 248 (1973) (consent must be "in fact voluntarily given, and not the result of duress or coercion, express or implied"); *United States v. Elrod*, 441 F.2d 353, 356 (5th Cir. 1971) ("consent means knowing approval"). Additionally, the Court observed at the hearing on this matter that Lopez relied on the assistance of a translator. *See* Hearing at 1. Lopez's need for an interpreter at the hearing was consistent with the need for him to have one during his police interview the day following his arrest, where Matuszewski observed that Lopez "seemed to be having difficulty in understanding English so [an interpreter] was called in to assist." *See* Government Exhibit 18 at 7.

car and told Lopez that he planned only to issue a warning citation, he immediately segued into

conversation designed to elicit consent to search. Although far from the most overt example of

coercion in the annals of Fourth Amendment jurisprudence, the subtle implication was that

Lopez's consent would brush away any remaining threat of a formal arrest.[76] Likewise, the extent

and level of Lopez's cooperation with Matuszewski was not, in this Court's evaluation, so

backward-bending and eager as to support a finding of voluntariness. Lopez complied with

Matuszewski's order to pull the vehicle to the side of the road, provided documents in response

to Matuszewski's inquiry, and answered Matuszewski's questions. By way of contrast, the Fifth

Circuit once affirmed as voluntarily given the consent of a defendant who used screwdrivers to

help the police remove interior panels of own his car, a search of which ultimately yielded

narcotics.[77] But even when not matched against such voracity, Lopez's compliance with

Matuszewski's requests did not rise to an extent and level of cooperation that would support a

finding of voluntariness.

     In the view of this Court, Lopez's apparent difficulty with the English language hobbles

---

[76] The United States Supreme Court has recognized that the tactic of questioning individuals alongside a highway after having been pulled over generally yields consent, even among those who understand the language. *See, e.g.*, *Brekemer v. McCarty*, 468 U.S. 420, 438 (1984) ("[T]he aura of authority surrounding an armed, uniformed officer and the knowledge that the officer has some discretion in deciding whether to issue a citation, in combination, exert some pressure on the detainee to respond to questions."); *Delaware v. Prouse*, 440 U.S. 648, 657 (1979) (explaining that a traffic stop is an unsettling show of authority that "may create substantial anxiety"); *Wong Sun v. United States*, 371 U.S. 471, 486 n.12 (1963) ("[E]ven today, when there is much less ignorance about these matter than formerly, there is still a general belief that you must answer all questions put to you by a policeman, or at least that it will be the worse for you if you do not.") (quoting Lord Patrick Devlin, *The Criminal Prosecution in England* at 32 (1958)).

[77] *United States v. McSween*, 53 F.3d 684, 685 (5th Cir. 1995).

the Government's effort to show that his consent was voluntary.[78] The Government's arguments to the contrary lack punch. When Matuszewski asked in English whether Lopez's car contained illegal substances, Lopez cheerfully nodded and answered affirmatively – twice. But when Matuszewski repeated the question in Lopez's native language, the answer changed with enormous emphasis. For whatever reason, Matuszewski – who testified that he is versed in Spanish phrases relevant to his profession[79] – saw no need to confirm Lopez's consent in the only language that Lopez clearly understood.[80] The doubt created by this omission, together with the bulk of the other factors weighing against the Government, is too great to support a finding of

---

[78] The noisy environment alongside the highway obviously compounded the language barrier. *See supra* at 9 n.35.

[79] Hearing at 24.

[80] The Government's final brief on this matter contends that Matuszewski did, in fact, make the request in Spanish. *See* Government's Rebuttal to Defendant's Memorandum in Support of Motion to Suppress Evidence [Docket No. 21] at 3 ("The officer asked in both English and then in Spanish if the defendant minded if he searched the car. The officer did not believe he had consent until he was sure the defendant understood."). However, during cross-examination at the hearing on this matter, Lopez's attorney asked Matuszewski, "You didn't feel it necessary for you to sp[eak] to him in Spanish about whether or not he was giving you consent to search his vehicle, did you?" Matuszewski answered, "No, sir, I didn't do that." Hearing at 57. The Court has conducted its own review of the traffic stop's video recording, and although the sounds of nearby automobiles make it impossible to determine with absolute certainty, no memorialization of a request to search appears to have been made in Spanish. The recording clearly captured audio of Matuszewski twice asking in English whether Lopez's car contained "anything illegal," as well as what appears to have been the same question in Spanish. However, the only clearly audible dialogue that follows immediately is in English – specifically, Matuszewski asking in English, "You don't mind if we look?" Later in the episode, Matuszewski began questioning Lopez again in English and elicited the statement, "You want to check [inaudible] car, no problem." Again, no Spanish is audible at this portion of the recording. This review of the evidence, alongside Matuszewski's testimony that he did not use Spanish to seek Lopez's consent, leads the Court to conclude that the Government is incorrect in its contention that Matuszewski asked Lopez in both English and Spanish for consent to search.

voluntariness.[81]

Therefore, judging all of the circumstances of this unique case,[82] as this Court is bound to do, the preponderance of the evidence does not persuade the Court that Lopez's consent was voluntary in character.[83]

## CONCLUSION

This Court is not oblivious to two of the final points made by the Government at the hearing held on this matter.

The Government solicited Matuszewski's strong – and informed – belief that Interstate 20 is a frequent channel of illegal narcotics. Given the nature of his tenure and the character of his work, the conclusion is perhaps beyond reproach. But far more people use the interstate system on a daily basis for legitimate reasons.

---

[81] *See United States v. Hernandez*, 913 F.2d 1506, 1510 (10th Cir. 1990) ("language barriers may inhibit a suspect's ability to [act] knowingly and intelligently"). This finding of fact should not be interpreted as a broader holding that the Fourth Amendment requires police to use Spanish when seeking the consent of Latinos. It does not. *See United States v. Alvarado*, 898 F.2d 987, 991 (5th Cir. 1990). This Court reaches its decision after a review of the totality of the circumstances of this unique case. However, whenever circumstances suggest to police that a driver understands Spanish more clearly than English, then obviously an abundance of caution counsels that the police use the driver's native tongue.

[82] The Court finds that the fourth and sixth factors delineated by the Fifth Circuit – whether the defendant was aware of his right to refuse to consent and whether the defendant believed that no incriminating evidence would be found – weigh in the Government's favor. Obviously, this leaves the Government's position at a 4-2 disadvantage to Lopez's argument, but ultimately, the Court heavily rests its factual finding on the unique problem that it observes the language barrier to have created in this case. *See United States v. Mendez*, 431 F.3d 420, 429 (5th Cir. 2005) ("no single factor is dispositive or controlling").

[83] For the sake of clarity, the Court notes that it has considered these factors relevant to Matuszewski's second attempt to procure Lopez's consent, and these same failings again lead the Court to conclude, as an issue of fact, that Lopez did not voluntarily consent to the search of his automobile.

The Fourth Amendment would not sanction police to move upon a neighborhood victimized by crime and to begin rounding up its inhabitants simply because they were found in an area frequented by criminals. The fact that similar people in similar places have acted illegally will not satisfy the Constitution's demand that every situation be judged by its unique facts and circumstances.

Likewise, the Court is not ignorant to the fact that the search of Lopez's car ultimately yielded several kilograms of cocaine. This is no reason to overlook an unconstitutional invasion of a person's privacy. As Justice Jackson wrote, courts overseeing criminal prosecutions only address a Fourth Amendment question "where the search and seizure yields incriminating evidence and the defendant is at least sufficiently compromised to be indicted. If the officers raid a home, an office, or stop and search an automobile but find nothing incriminating, this invasion of the personal liberty of the innocent too often finds no practical redress."[84] But "[c]ourts can protect the innocent against such invasions indirectly and through the medium of excluding evidence obtained against those who frequently are guilty."[85]

The Government, through its well meaning law enforcement officials, "has a compelling interest in eliminating the flow of illegal drugs into our society . . . [b]ut all things are not permissible even in the pursuit of a compelling state interest. The Constitution does not cease to exist merely because the government's interest is compelling."[86] Like those well meaning law enforcement officials, this Court has a responsibility: to ensure that constitutional protections are

---

[84] *Brinegar v. United States*, 338 U.S. 160, 181 (1949) (Jackson, J., dissenting).

[85] *Id.*

[86] *Commonwealth v. Martin*, 534 Pa. 136, 144, 626 A.2d 556, 561 (1993).

not deprived by the whims and suspicions of those same well meaning law enforcement officials.

The Supreme Court explained fifty years ago that under our criminal justice system, where fealty to the Constitution trumps all other concerns, "[t]he criminal goes free, if he must, but it is the law that sets him free. Nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence."[87]

If Lopez is indeed guilty of the crime for which he stands indicted, then fidelity to the Fourth Amendment demands that the Government prove it without the products of its unreasonable search. As Justice Scalia has counseled, "there is nothing new in the realization that the Constitution sometimes insulates the criminality of a few in order to protect the privacy of us all."[88]

Lopez's Motion to Suppress and Dismiss Evidence is granted.

SO ORDERED this Twenty-First day of September 2011.


  /s/ *Carlton W. Reeves*
Hon. Carlton W. Reeves
United States District Court Judge

---

[87] *Mapp v. Ohio*, 367 U.S. 643, 659 (1961).

[88] *Arizona v. Hicks*, 480 U.S. 321, 329 (1987).